(Reap. Dec. 10908)

ARTHUR J. FRITZ & CO., INC., ET AL. *v.* UNITED STATES

Entry No. 1260, etc.

(Decided March 8, 1965)

*Glad & Tuttle* (*George R. Tuttle, Jr.*, of counsel) for the plaintiffs.

*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

WILSON, Judge: The merchandise involved in these appeals consists of canned boiled baby clams, packed in 10-, 8-, or 6⅔-ounce cans, exported from Japan during the period from 1951 to and including 1961, except the period from November 1953 through June 1954.

Appraisement of the canned clams in question was based, in accordance with the provisions of a Presidential proclamation, issued under authority of section 336 of the Tariff Act of 1930 (19 U.S.C. § 1336), upon American selling price (section 402a(g), Tariff Act of 1930), as amended by the Customs Administrative Act of 1938, as to such clams as were entered prior to February 27, 1958, and under section 402(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, as to merchandise covered by entries made on or after February 27, 1958.

Appraisement of the merchandise was based on the American selling price of a Portland, Maine, clam (R. 12) identical to the canned boiled baby clams involved in *Geo. S. Bush & Co., Inc.* v. *United States*, 48 Cust. Ct. 689, A.R.D. 140 (R. 19–20). The Government conceded that the imported baby clams are "more like a Pacific Coast hard-shell clam, little neck and butter clams, than the soft-shell Portland, Maine, clams" (R. 24). It did not concede, however, the existence of a market for the Pacific coast clams (R. 24–25). Plaintiffs, in this case, contend that the imported clams should have been appraised on the basis of the American selling price of the "like" Pacific coast clams rather than that of the "similar" Portland, Maine, clams; that an American selling price which meets the statutory requirements existed for the "like" Pacific coast clams at the claimed values during the period involved; and that a principal market existed in the Seattle area during the periods covered by these appeals sufficient to establish an American selling price for such clams.

The provisions of the statutes relative to American selling price valuation herein involved are as follows:

Section 402a(g) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938:

(g) AMERICAN SELLING PRICE.—The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

Section 402(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(e) AMERICAN SELLING PRICE.—For the purposes of this section the American selling price of any article produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the article in condition packed ready for delivery, at which such article is freely sold or, in the absence of sales, offered for sale for domestic consumption in the principal market of the United States in the ordinary course of trade and in the usual wholesale quantities, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such article when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported articles.

It is well settled that the party challenging the correctness of the value at which merchandise was appraised has the dual burden not only of showing that such valuation was in error but that the claimed dutiable value is correct. *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593; *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495. To do this, the party must meet every material issue in the case, specifically with respect to the elements to be established in accordance with statutory requirements. Upon failure to do so, the value fixed by the appraiser remains in full force and effect. The record covering the appeals herein is inconclusive, in my opinion, with respect to the establishment of the values claimed by the plaintiffs for the involved merchandise on the respective dates of exportation. Reference to the pertinent testimony, as given below, supports, in my opinion, the conclusion here made.

Plaintiffs introduced the testimony of six witnesses. Mr. James A. Edington, president of the Fan-Sea Foods Co., testified that he was familiar with the 8-ounce canned whole baby clams the subject of reappraisement appeal R62/14299 (R.16–18). He further testified that he was present at the time that the case of *Geo. S. Bush & Co., Inc.* v. *United States*, 48 Cust. Ct. 689, A.R.D. 140, was tried in 1960. The latter case involved 10-ounce canned boiled baby clams. The witness stated that the merchandise involved herein is the same as that in question in the *Bush* case, *supra*, except that the pack was changed from a 10-ounce to an 8-ounce pack (R.19). The clams involved in the *Bush* case were packed by the Iwerson Canning Co., Bellingham, Wash.

Byron Bertram, a customs line examiner at the port of Seattle since 1946, testified that his line includes canned boiled baby clams and that he is familiar with the decision in the *Bush* case, *supra*, A.R.D. 140. He stated that after that decision, he made inquiries of the canners in the Seattle area as to the price at which they sold little neck clams (R. 28–29). His best recollection was that the price at which little neck clams during July and August 1961 were sold in

the Seattle area for an 8-ounce can or 4-ounce drained weight was $7 a case of 24 tins, with a cash discount of 1½ per centum (R. 38). On cross-examination, Mr. Bertram stated that the price given by him related to the Seattle area. He agreed that there were canners elsewhere on the Pacific coast and that their prices for the 8-ounce canned clams could be different and higher than the price he quoted (R. 38). Mr. Bertram subsequently testified that the appraised value of clams such as here in issue did not remain the same over the 10-year period beginning from 1951 and that there have been variations in the market (R. 44). He further testified that it was his recollection that within the past few years or since the decision rendered in the Bush case, supra, not more than 500 cases all told for all sizes of packs were produced in any one year in the Puget Sound area (R. 50). The witness further testified that, as far as he knew, the 10-ounce size was not packed in the Seattle area but that for 3 or 4 years prior to 1961 only the 8-ounce-size tin was sold in that area, the price as given being $7 per case of 24 tins, 8-ounce size (R. 51–52). Mr. Bertram then stated that the Iverson company does not now pack canned clams; that its last sales were in 1956 and that none were made since that time (R. 53). When interrogated as to whether there was a market in the Seattle area for the domestic hard-shell canned clams, he stated that, while there was a commercial market, he would not consider it a sufficient market for American selling price valuation purposes (R. 54).

It appears that, in the Bush case, supra, the parties to that controversy stipulated that, for the period involved therein, namely, November 1953 through June 1954, based upon the sales of Iverson Canning Co. of Bellingham, Wash., the price at which whole little neck clams produced in the United States, packed twenty-four 10-ounce tins per carton, were freely offered for sale was $7.50 per carton, less 1½ per centum cash discount, less one-tenth of 1 per centum swell allowance (R. 112–113). Plaintiffs' witness Bertram, on being recalled to the stand, agreed that the stipulation stated the facts as he understood them at that time (R. 114). When asked by Government counsel if the stipulation in the Bush case described the market conditions subsequent to 1953, he stated that "market conditions were not mentioned" (R. 115), and that his testimony as to the sales conditions that existed in the clam market in the Seattle area referred only to the 9-month period which was the period in issue in the Bush case, supra. (R. 113–115.)

Plaintiffs also called as their witness Mr. Wilbur S. Harms, owner and manager of the Guilford Packing Co. and associated with that concern since 1946, primarily in the canning and selling of clams. Mr. Harms, who, as disclosed by the record, had canned and sold little neck clams in sizes 7½ ounce, 10 ounce, and 16 ounce, was interrogated

as to the prices at which he had sold these three different clams over the past 10 years. He testified that "it's hard because it fluctuates to a certain extent" and, when asked to give his current prices, stated that "I haven't packed any to speak of" (R. 95). Mr. Harms stated that he sold the 10-ounce-size can in the past, "approximately six years ago" in 1957. When asked if the prices he had been giving were similar for that time, the witness stated that "They could hardly be comparable" (R. 96). Mr. Harms further testified that he had not packed that size since 1957 "due to the lack of market for it" (R. 98). While he stated that he had sold approximately 400 cases of canned little neck clams in the last 2 years, he had no approximation for 1961, stating that the amount would have been less for that year and less for 1959 and 1958, his packing having gone down each year (R. 100). When asked if it were true that there was really no market for the canned little neck clams since 1956, Mr. Harms testified as follows:

A. In the way they are being packed at the present time, from foreign markets and one thing or another, I am not able, if that's what you wish to know, I am not able to compete and we have gone to a different method of canning these clams. Instead of canning the clams now and shelling them I am selling them shell and all. And I have created a market in Los Angeles and Chicago that way. * * * [R. 102.]

Plaintiffs' witness Ivar Wendt, Seattle, Wash., who the record indicates has been engaged in the fish brokerage and canning business since 1940, testified that his main sales had been to Hartford, Conn., and that his local sales "have always been very small" (R. 63). When asked, on cross-examination, if it were not a fact that the Iwerson Canning Co. had not been packing the hard-shell little neck clams since 1956, Mr. Wendt stated that "I believe that very few little neck clams have been canned since 1956" (R. 68), stating, to the best of his recollection, that sales by him of hard-shell little neck clams had stopped about 1956.

Plaintiffs attempted through the testimony of two customs agents at the port of Seattle, Mr. Gene S. Orr and Mr. Wilbur Underwood, to obtain information relative to any investigations concerning clams which are packed and sold in the Seattle area. Their testimony shed little light relative to the prices paid for clams in that area on the pertinent dates of exportation. It appears that only Mr. Orr had made such an investigation of clams about 5 to 7 years ago and had made a report on the subject to customs authorities. Defense counsel's objection to the request of counsel for the plaintiffs for production of the report was sustained by the court on the ground of confidential privilege (R. 78).

The testimony of plaintiffs' witnesses Harms, Bertram, and Wendt, as outlined above, is insufficient and not persuasive, in my opinion, to establish that the prices claimed by the plaintiffs herein should

be taken as the values for the involved merchandise on the respective dates of exportation. No definitive values upon which to predicate a finding of value for the merchandise here under consideration have been established by their testimony, even assuming that at such times the Pacific coast area was the principal market in the sale of hardshell little neck clams upon which appraisement of the imported merchandise was based, a fact which, in my opinion, has not been adequately established in this record. Plaintiffs had the burden of establishing all the elements under the American selling price definition in order to support their claimed values for the clams packed in the sizes here exported. The evidence of record fails to establish, in my opinion, that the Seattle area was the principal market for boiled baby clams like those in question on or about the respective dates of exportation, nor does the evidence negative the existence of a principal market elsewhere. While, concededly, the west coast area was the principal market for the clams involved in the *Bush* case, *supra*, that concession was limited to the period from November 1953 through June 1954 and has no application to the merchandise here in issue, the value of which on or about the dates of exportation must be independently established. Sales or offers for sale are necessary to establish principal market. *United States* v. *Mutual Supply Co. et al.*, 11 Cust. Ct. 461, Reap. Dec. 5950. Further, the plaintiffs have failed to establish that the market they contend for as the "principal" market produced the greatest volume of sales of the Pacific coast clam in accordance with statutory requirements. Plaintiffs' witness Wendt, as heretofore noted, testified that his sales were made mainly in Hartford, Conn. (R. 63, 69). Also, plaintiffs' witness Bertram agreed that there were canners elsewhere on the Pacific coast; that the prices might be different elsewhere for 8-ounce canned clams; and that they might be higher than those given by him. As to the volume of sales, the record clearly shows that, since 1956, sales in the Seattle area were negligible and that very few have been packed since that date (R. 32, 54, 68–70, 98, 102–103). Accordingly, the fact that a principal market may have existed for clams like those at bar for a 9-month period in 1953 and 1954, as testified to by plaintiffs' witness Bertram, does not prove that the principal market as claimed by the plaintiff existed in preceding or succeeding years, or even that the principal market remained the same, particularly in view of changing market conditions, as noted in the record. In addition, the prices here claimed as representative of the value of the imported baby clams are mainly speculative. Willingness to sell merchandise at a certain price is no evidence of a market price. *Transatlantic Shipping Co., Inc.* (*Absorbo Beer Pad Co., Inc.*) v. *United States*, 28 CCPA 19, C.A.D. 118.

Section 336 of the Tariff Act of 1930 provides as follows:

(a) CHANGE OF CLASSIFICATION OR DUTIES.—In order to put into force and effect the policy of Congress by this Act intended, the commission (1) upon request of the President, or (2) upon resolution of either or both houses of Congress, or (3) upon its own motion, or (4) when in the judgment of the commission there is good and sufficient reason therefor, upon application of any interested party, shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article. In the course of the investigation the commission shall hold hearings and give reasonable public notice thereof, and shall afford reasonable opportunity for parties interested to be present, to produce evidence, and to be heard at such hearings. The commission is authorized to adopt such reasonable procedure and rules and regulations as it deems necessary to execute its functions under this section. The commission shall report to the President the results of the investigation and its findings with respect to such differences in costs of production. If the commission finds it shown by the investigation that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic article and the like or similar foreign article when produced in the principal competing country, the commission shall specify in its report such increases or decreases in rates of duty expressly fixed by statute (including any necessary change in classification) as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total increase or decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute.

(b) CHANGE TO AMERICAN SELLING PRICE.—If the commission finds upon any such investigation that such differences can not be equalized by proceeding as hereinbefore provided, it shall so state in its report to the President and shall specify therein such ad valorem rates of duty based upon the American selling price (as defined in section 402(g)) of the domestic article, as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute, and no such rate shall be increased.

(c) PROCLAMATION BY THE PRESIDENT.—The President shall by proclamation approve the rates of duty and changes in classification and in basis of value specified in any report of the commission under this section, if in his judgment such rates of duty and changes are shown by such investigation of the commission to be necessary to equalize such differences in costs of production.

Section 336, *supra*, was amended, with minor changes, by T.D. 54681 and T.D. 54165.

The Tariff Commission found that clams from Japan, the principal competing country, were in competition with all domestic clams (except razor clams) and all classes in combination with other substances (except clam chowder) packed in airtight containers. Its findings and recommendations were the basis of the President's proclamation, T.D. 47031, upon which appraisement of the imported clams upon the basis of the American selling price was made. As the purpose of section 336 is to protect "similar" as well as "like" domestic articles from unfair foreign competition, the American selling price of any "similar" article within the purview of the Presidential proclamation applying the American-selling-price formula may be selected as the

basis of appraisement of the competing foreign article. While appraisement of merchandise under the American-selling-price formula might be predicated in the first instance upon a domestic article "more like" the imported item rather than upon a domestic article which is merely "similar," nothing under the statute precludes appraisement upon the basis of a "similar" domestic article where, as in this case, plaintiffs have not established within the statutory definitions the value of a "more like" domestic clam, namely, the Pacific coast hard-shell little neck clam. It has been conceded that the clam upon which appraisement of the merchandise here under consideration was based, namely, the Portland, Maine, canned clam, was "similar" to the imported clams. No evidence has been presented by the plaintiffs in this case to overcome the presumption of correctness attaching to the appraisement of the imported clams based upon the "similar" Portland, Maine, canned clams. Plaintiffs herein, having failed in their burden of establishing that their claimed values for the imported clams are correct for appraisement purposes, and, in addition, having failed to present substantial evidence to overcome the presumption of correctness attaching to the appraiser's finding of value in each of the involved importations, the appraised value in each case must stand.

On the basis of the record before me, and for all of the reasons hereinabove set forth, I find as facts:

1. That the merchandise in question consists of boiled baby clams, packed in 10-, 8-, and 6⅔-ounce cans, exported from Japan from 1951 to 1961, except for the period from November 1953 through June 1954.

2. That, pursuant to Presidential proclamation, dated May 1, 1934, T.D. 47031, such clams were appraised on the basis of American selling price of a canned soft-shell clam packed in Portland, Maine.

3. That the said soft-shell clam used as the basis for appraisement is similar to the imported clams.

4. That there is no substantial evidence upon which to find a value for the imported clams based upon the American selling price of the domestic Pacific coast hard-shell little neck clams, conceded to be "more like" the imported clams.

5. That the presumption of correctness attaching to the appraiser's finding of value with respect to the merchandise involved in each of the appeals herein has not been overcome.

I conclude as matters of law:

1. That the Portland, Maine, clam was properly adopted by the appraiser as the domestic article upon which to predicate an American selling price for the imported merchandise.

2. That the proper basis of appraisement of the imported canned Japanese baby clams is American selling price, as that value is defined in section 402a(g) of the Tariff Act of 1930, as amended by the Cus-

toms Administrative Act of 1938, as to merchandise entered prior to February 27, 1958, and as to merchandise entered on or after February 27, 1958, the proper basis of appraisement is American selling price, as that value is defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. That such statutory value is, in each case, the appraised value. Judgment will be entered accordingly.