GETZ BROS. & CO. et al.

v.

UNITED STATES.

Reap. Dec. 11106.

United States Customs Court.

Nov. 22, 1965.

Lawrence & Tuttle and Glad & Tuttle, San Francisco, Cal. (Edward N. Glad, Los Angeles, Cal., of counsel) ; Barnes, Richardson & Colburn, New York City (Hadley S. King, New York City, of counsel), for plaintiffs.

John W. Douglas, Asst. Atty. Gen. (Samuel D. Spector and Morris Braverman, Washington, D. C., trial attys.), for defendant.

WILSON, Judge.

In this case, 46 reappraisement appeals were consolidated for trial. The appeals challenge the appraised value of certain Japanese plywood, exported from various Japanese ports during the years 1957, 1958, 1959, 1960, and 1961. By stipulation of the parties, the merchandise involved in the various imports is limited to plywood of the lauan or the sen species in a blend of 50 per centum first quality and 50 per centum second quality in doorskin sizes, $\frac{1}{4}$ inch and 4 by 7 or 8 feet, and $\frac{3}{4}$ inch and 4 by 7 or 8 feet. It was further agreed that where the term "Philippine mahogany" appears that term means the same as "lauan." The parties also stipulated that lauan and sen plywood are not on the final list and that the proper basis of appraisement for the merchandise covered by all of the appeals is export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, except as to merchandise covered by R58/8800, which was exported from Japan in March 1957, and which was appraised on the basis of export value, as defined in section 402a(d) of the Tariff Act of 1930, as amended, supra.

The record in this case is voluminous but, in large part, repetitious and cumulative. The plaintiffs introduced some 82 documentary exhibits and the defendant 19 exhibits. The importers called 16 witnesses, and 8 witnesses were called on behalf of the defendant.

The heart of the controversy in all the cases is whether the export value of the involved plywood was properly determined by the Government, which took the prices at which such or similar merchandise was sold or offered for sale at the time of exportation to the United States by certain trading houses which placed orders with manufacturers on behalf of American exporters, or whether the export value should have been determined by the price at which such or similar merchandise was sold or offered

for sale at the time of exportation to the United States by the mills or manufacturers. If such mills or manufacturers sold or offered for sale at the time of exportation of the merchandise such or similar merchandise freely and to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for export to the United States, then the export value should have been determined by the prices at which such mills' or manufacturers' sales or offers for sale were made.

■ There is no doubt but that where a manufacturer or producer freely offers his merchandise for sale to all purchasers and under the other conditions and terms specified in the statute, the manufacturer's price must be taken as the basis for appraisement, and that the price of the dealer who purchases from such manufacturer or producer cannot be used to predicate the establishment of an export value. See S. S. Kresge Co. et al. v. United States, 72 Treas.Dec. 1140, Reap. Dec. 4155, affirmed in United States v. S. S. Kresge Co. et al., 73 Treas.Dec. 1547, Reap.Dec. 4310; affirmed in United States v. S. S. Kresge Co. et al., 26 CCPA 349, C.A.D. 39; R. J. Saunders & Co., Inc. (Perry H. Chipurnoi, Inc.) v. United States, 42 CCPA 55, 59, C.A.D. 570; Melba B. Rodriguez v. United States, 23 Cust.Ct. 296, 300, Reap.Dec. 7752; Romana Fashions, Inc. v. United States, 49 Cust.Ct. 447, 450, Reap.Dec. 10371.

The issue is not, as contended by the Government in its brief, whether "statutory export value is represented by sales and offers to sell, (a) by plywood manufacturers to Japanese dealers (hereinafter described as trading houses), which purchased the said plywood for unrestricted disposition, or (b) by the trading houses in Japan to all purchasers in the principal markets of Japan in usual wholesale quantities and in the ordinary course of trade for exportation to the United States." To pose the issue in

that form, presupposes that there were no sales made by the mills or manufacturers to anybody except the so-called trading houses. Such an assumption is clearly not warranted, even by the defendant's own testimony.

There is really no question in this case concerning principal markets or usual wholesale quantities. The evidence clearly shows that the sales were made in the principal markets in Japan; that the prices did not vary according to the quantities sold; and that the unit values of the merchandise remained the same, regardless of the quantity sold in the market. Neither is there any question concerning the cost of containers and coverings, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. In all cases, whether the merchandise was purchased directly from the manufacturer or through a trading house, it was delivered f. o. b. port in Japan, ready for shipment.

Our first inquiry is whether the mills or manufacturing establishments in Japan that produced and sold the merchandise in question offered such or similar merchandise freely for sale to all purchasers in the ordinary course of trade for export to the United States. Before attempting to answer this question, let us refer to the previous cases involving substantially, if not entirely, the same questions of law and fact as now concern the court.

In the case of United States v. National Carloading Corp., 46 Cust.Ct. 745, A.R.D. 125, the court held that an affidavit by one Ito, the managing director of Nakamura Plywood Co., a milling company, in which the affiant, who was in charge of all domestic and overseas sales for his company, stated that plywood made of lauan Philippine mahogany was freely offered to anyone who cared to buy for export to the United States, at prices which included packing costs and freight, and handling charges to the point of shipment, and that such prices did not vary according to quantity pur-

chased, was sufficient to establish a *prima facie* case on that point. The affiant's further statement to the effect that his company freely offered and sold three qualities of lauan plywood at stated prices per thousand square feet, and that a blend of the three qualities was "freely offered * * * to anyone who cared to purchase" or export to the United States "at $69.56 per thousand square feet" was held to be a statement of fact and not a mere conclusion of the affiant.

In the National Carloading case, supra, there was evidence (page 748) to the effect that—

> While some manufacturers have sold their merchandise for direct export, these instances are exceptional and are stated by the Japan Plywood Exporters Association to constitute less than 20% of the total sales. The ordinary course of trade is for manufacturers to sell to exporters on an FOB shipping port basis. The exporters in turn sell to importers in the United States on the same basis or on a C&F or CIF basis depending on the desires of the importer. The exporters add as their profit a percentage over cost depending on market conditions, usually not less than 2% and frequently considerably more. * * * Generally speaking, the prices of these manufacturers who do sell directly are maintained at about the same level as· the prices quoted by exporters.

The trial judge, in the foregoing case, National Carloading Corp. v. United States, 43 Cust.Ct. 531, Reap.Dec. 9535 (page 534), in referring to the evidence set forth in the previous paragraph, had held that—

> The first sentence of the foregoing excerpt shows that sales to others than exporters or trading houses were, in fact, made, and that they constituted a substantial and not "exceptional" (i. e., less than one-fifth but presumably more than one-sixth) part of total sales. The sentences which follow contain a conclusion directly at variance with the facts stated in the first sentence, i. e., that "The ordinary. course of trade is for manufacturers to sell to exporters," etc. The only proper conclusion that can be drawn from the first sentence is that the ordinary course of trade was for manufacturers to sell *both* to exporters and for direct export (i. e., to American importers). The *result* of the offers and sales may have been that more than 80 per centum of the sales were to exporters, but this does not establish the ordinary course of trade in the offer and sale of the products involved. A manufacturer might offer his products to *all* purchasers who cared to buy, and his entire output might be taken by one purchaser, but that fact does not establish that he offered his merchandise *only* to the eventual buyer or that the ordinary course of trade was to offer and sell only to one buyer. [Italics quoted.]

In the National Carloading case (A.R. D. 125), supra, the court stated, page 753:

> We are of opinion, therefore, that the evidence proffered by appellee at the trial of the instant action established, *prima facie*, that merchandise, such as that at bar, was freely offered for sale, in the ordinary course of trade, to any one who cared to buy it at the price of $69.56 per thousand square feet, which price did not vary with the quantity purchased. * * *

▆ It is further valuable to note that the court, in the National Carloading case, supra, held that the fact that the buyers had to secure a quota before exporting their merchandise did not prevent the finding of an export value on the level of the sales by the mills and manufacturers. The court stated "the quota limitations, being burdens imposed upon the buyers, were not restrictions upon the free offerings of this merchandise," citing Rico, Inc. v. United States, 44 Cust.Ct. 788, A.R.D. 121. In

the opinion of the court, the foregoing case, A.R.D. 125, is very persuasive, if not controlling, in the determination of the value of the merchandise involved in the cases at bar.

In the case of Ziel & Co., Inc. v. United States, 49 Cust.Ct. 454, Reap.Dec. 10374, the merchandise involved also consisted of plywood, exported from Japan. It was agreed by the parties that export value, as defined in section 402a(d) of the Tariff Act of 1930, was the proper basis for appraisement. It appeared that the importer purchased plywood both from suppliers in Japan who were manufacturers and from so-called trading houses who were not manufacturers. The weight of the evidence established that the plywood in question was freely offered and sold at certain prices to all who cared to buy, without restriction, other than the condition that it be exported and not resold in Japan. The court held that the latter restriction did not bar a finding of export value, since export value is concerned only with the price of exportation to the United States. The court, following the holding of the court in the National Carloading case, A.R.D. 125, supra, found the proper value of the merchandise there involved to be the freely offered prices by the manufacturer rather than those of the trading houses.

In Pacific Wood Products Company and Railway Express Agency, Inc., et al. v. United States, 49 Cust.Ct. 460, Reap.Dec. 10377, the court found that where the evidence established that certain plywood was freely offered to all who cared to buy for export to the United States, the only restriction being that it could not be resold for consumption in Japan and must be exported, the prices established by the manufacturer were the proper ones for valuation purposes under section 402a(d), supra, the court again following the National Carloading case, supra.

It appears to the court that the facts in the present cases are stronger in support of finding that the sales by the manufacturing mills provide the proper basis for determining export value than are the facts in the previously decided cases. In the present case, certain facts are established by a heavy preponderance of evidence. In the affidavits offered in evidence by the plaintiffs, all of which are substantially the same, it definitely appears that all the manufacturing establishments from which purchases were made in the appealed cases herein offered their merchandise for sale to all purchasers who desired to buy for export to the United States and not merely to the so-called trading houses.

In plaintiffs' exhibit 1, the affidavit of Osamu Tanaka, chief of the export department of Sakamasa Plywood Works, Ltd., Shimizu City, Japan, the following statement appears:

That ever since the market in the United States opened up for Japanese plywood my company has manufactured and freely offered to anyone who cared to buy for export to the United States plywood and doorskins in sizes of different widths and lengths in varying thicknesses, made of imported or native Japanese hard woods.

That the price at which we freely offered plywood to anyone for export to the United States included the cost of packing and other charges incident to placing the merchandise in condition packed ready for shipment to the United States, as well as the freight from our factory or principal place of business and other handling charges necessary to placing the merchandise on vessels to be transported to the United States.

That the prices which were quoted and which were received by us for sale for export to the United States did not vary because of the quantity purchased.

That the plywood and doorskins sold for export to the United States are not the same or similar to plywood and doorskins sold for consumption in Japan. The sizes and quality specifications are different.

That there is no demand on the Japanese home market for plywood and doorskins made in accordance with United States specifications.

That we know and control the destination of our plywood and doorskins when sold for export to the United States as we, mark all the crates on instructions of the buyer and deliver the merchandise to the exporting vessel, after having received from the buyer the export permit which he has received from the Japanese Government or its authorized agency.

Numerous other affidavits by representatives of Japanese plywood manufacturers corroborated Mr. Tanaka's statements.

■ Furthermore, the oral evidence indicates that, in substantially all, if not all cases, the plywood was sold to an American importer before it was manufactured, and as it was manufactured it was marked with the American importer's brand. These markings were made at the request of the purchaser, usually at the time the orders were placed, or when doorskins were ordered at the time the specifications for these doorskins were received (R. 45; R. 76–77; R. 103–104; R. 133–134; R. 167; R. 194; R. 249; R. 268; R. 291). This was done even where sales were made through the intermediary trading houses. It further appears satisfactorily from the evidence that the trading houses had no merchandise of their own to sell at any time. The trading houses acted merely as agents for American importers. The trading houses never placed orders with the mills for the purchase of plywood until they had received purchase orders from American importers. The marking of the crates and panels was done at the mills by mill personnel (R. 46; R. 68; R. 104; R. 168; R. 209; R. 258). In addition, the record discloses that all the mills sold their export plywood at an f. o. b. Japanese port price, which price included delivery of the plywood to the exporting vessel (R. 291–292; R. 341; R. 373; R. 386; R. 436).

It further appears from the preponderance of the evidence that the purpose of using trading houses as a buying medium was only to obtain export quotas, the Japanese Government having imposed quota regulations upon the export of plywood in the latter part of 1955. The testimony in the case at bar indicates that those importers of plywood without Japanese export quotas usually had to have recourse to trading houses or to the mills with quotas in order to have the plywood exported to the United States (R. 41; R. 76; R. 90–91; R. 169; R. 202; R. 257; R. 286; R. 342; R. 349). The record further discloses that it was the responsibility of the American buyer to obtain a quota for export of plywood as the basis for securing a permit to ship the plywood out of Japan. The responsibility of obtaining the quota and shipping permit rested upon the purchaser (plaintiffs' exhibits 1 through 36 and defendant's exhibits E, F, and G), and not upon the manufacturers and did not affect the free market between the manufacturer and the purchasers. The existence or issuance of an export license had nothing to do with the offer and sale of merchandise such as that at bar for exportation. National Carloading Corp. v. United States, 43 Cust.Ct. 531, 540, Reap.Dec. 9535. Further, while admittedly export quota had a value (Witness Davidson, R. 293, and defendant's exhibit A), the additional cost that some mills charged for the use of their quota was no part of the purchase price of the export plywood nor any part of the costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. Plywood is the merchandise being exported and not export quota. It appears that when a mill charged for arranging an export permit, this extra charge was lumped with the purchase price of the plywood for convenience in billing. Such charge, however, was not a part of the *per se* value of the merchandise. Collective exhibit B, attached to plaintiffs' exhibit 66, shows an offering from a mill, Shingu

Shoko, Ltd., at two different prices for the same plywood, depending on whose quota was to be used in exporting the plywood. Accordingly, any charge made by the mill for an export quota in those instances where the importer did not have such quota, which apparently is only an expense in obtaining an export license, must be considered an expense occurring after the merchandise has been placed in condition, packed ready for shipment to the United States, and is not a part of the value of the merchandise exported. See, in this connection, International Packers, Limited v. United States, 42 Cust.Ct. 453, Reap.Dec. 9304, affirmed in United States v. International Packers, Limited, 44 Cust. Ct. 768, A.R.D. 118, affirmed in Same v. Same, 48 CCPA 80, C.A.D. 769.

We are of opinion that the evidence clearly shows that the manufacturers of the merchandise herein involved offered their product in a free market to all purchasers in accordance with the conditions specified in the tariff act. The statutes here involved are as follows:

Section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402a(d) of the Tariff Act of 1930, as amended, supra:

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

In the opinion of the court, the sales by the manufacturing mills conformed to the requirements of the foregoing statutes. There is, therefore, no necessity of inquiring further concerning sales made by the trading houses. That leaves for determination the freely offered prices of the mills for the merchandise involved at the time of exportation. In the various affidavits are found values per 100 square feet. In some instances, the figures are given in yen and then converted into dollars. It appears to the court that it makes no difference whether, in some instances, the quotations are in yen, since it is easy to convert the value of the yen into the equivalent value in dollars. The fact that most of the affidavits making up plaintiffs' exhibits 1 to 36 list prices in dollars and all the prices shown on schedules B, C, and D in the schedules attached to plaintiffs' brief show prices in dollars when the mills are paid in yen (R. 364; R. 386; R. 445; R. 495; and defendant's exhibits H, J, L, M, and P) does not disprove the accuracy of the prices listed on these attached schedules. After a careful examination of the affidavits, the court is of the opinion that the pricelist as set forth at the end of plaintiffs' brief is correct and that the prices therein set forth represent the export value of the involved merchandise at the time

of exportation to the United States, said value being that of such or similar merchandise which was freely offered for sale to all purchasers in the principal markets of Japan at the time in question, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, and that the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, were included in the f. o. b. cost as the merchandise was delivered at various ports for shipment.

On the basis of the record here presented, the court finds as facts:

1. That the merchandise involved in these appeals consists of rotary plywood of the lauan or the sen species in a blend of 50 per centum first quality and 50 per centum second quality, exported between March 1957 and May 1961, which plywood consisted of doorskin sizes and panels ¼ inch by 4 feet by 7 or 8 feet, or ¾ inch by 4 feet by 7 or 8 feet;

2. That, prior to February 28, 1958, such or similar merchandise was not freely offered for sale for home consumption in Japan;

3. That lauan and sen plywood are not on the final list promulgated under the Customs Simplification Act of 1956, T.D. 54521;

4. That, at or about the time of exportation of the merchandise in question, such merchandise was freely offered for sale to all purchasers in the principal markets of Japan in the usual wholesale quantity and in the ordinary course of trade, for exportation to the United States, including the cost of all containers and coverings of whatever nature and all other costs and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, at the following net packed prices in units of 100 square feet:

| Court and collector's No. | Manufacturer | Date of exportation | Value per 100 sq. ft., net packed |
|---|---|---|---|
| | *Rotary lauan doorskins* | | |
| R60/17874–4782 | Sakamasa Plywood Works, Ltd. | 4–16–59 | $ 4.20 |
| R61/16071–8992 | Ishikawa Plywood Co., Ltd. | 2–28–59 | 4.70 |
| R61/16072–8993 | Asai Plywood Industrial Co., Ltd. | 3– 3–59 | 4.75 |
| R61/17449–9417 | Senju Plywood Co., Ltd. | 3–30–59 | 4.80 |
| R60/6641–3753 | Kyodo Veneer & Plywood Co., Ltd. | 1–15–59 | 4.60 |
| R60/17884–4792 | Arakawa Plywood Co., Ltd. | 5–18–59 | 4.50 |
| R61/220–5160 | Hokushin Plywood Co., Ltd. | 5–26–59 | 4.60 |
| R60/5428–23692 | Eidai Industrial Co., Ltd. | 3– 3–59 | 4.90 |
| R60/9813–24912 | Adachi Plywood Co., Ltd. | 4–30–59 | 4.70 |
| R61/16430–29207 | Toyo Plywood Co., Ltd. | 3–29–60 | 4.00 |
| R60/5016–23607 | Dantani Plywood Co., Ltd. | 5–13–59 | 4.70 |
| R60/5134–23608 | "      "      "      " | 5–13–59 | 4.70 |
| R60/8003–24358 | Toyo Plywood Co., Ltd. | 1–12–59 | 4.50 |
| R60/8008–24363 | Arakawa Plywood Co., Ltd. | 2– 7–59 | 4.45 |
| R60/4746–23489 | Noda Plywood Co., Ltd. | 1–28–59 | 4.80 |
| R59/14631–21492 | Senju Plywood Co., Ltd. | 2–26–59 | 4.80 |
| R59/14631–21492 | Toyo Veneer Kogyo K. K. | 2–26–59 | 4.70 |
| R60/7705–130 | Marutomi Wood Products Co. (Hamada Plywood Mfg. Co.) | 2–21–59 | 4.50 |
| R60/7513–2824 | Adachi Plywood Co., Ltd. | 3– 6–59 | 4.80 |
| R64/3526–7495 | Noda Plywood Co., Ltd. | 5–30–61 | 4.60 |
| R58/8800–18826 | "      "      "      " | 3–26–57 | 4.11 |
| R60/9667–22867 | "      "      "      " | 3–23–59 | 4.80 |

| Court and collector's No. | Manufacturer | Date of exportation | Value per 100 sq. ft., net packed |
|---|---|---|---|
| | *Rotary lauan doorskins* | | |
| R60/9673–22873 | Toyo Veneer Kogyo K. K. | 2–28–59 | $4.70 |
| R61/746–24551 | Nihei Plywood Co., Ltd. | 5–26–59 | 4.45 |
| R62/8440–28828 | Marutomi Wood Products Co. (Hamada Plywood Mfg. Co.) | 3–24–59 | 4.50 |
| R62/12105–10022 | Noda Plywood Co., Ltd. | 1–10–59 | 4.80 |
| | *Rotary lauan plywood size ¼″ by 4′ by 7′ or 8′* | | |
| R60/17844–4752 | Showa Plywood Mfg. Co., Ltd. | 6–29–59 | 7.30 |
| R60/17855–4763 | Kyodo Veneer & Plywood Co., Ltd. | 7–31–59 | 6.40 |
| R60/16395–4663 | Dantani Plywood Co., Ltd. | 6–17–59 | 6.80 |
| R60/21097–24196 | Nakamura Plywood Co., Ltd. | 12–14–59 | 6.60 |
| | *Rotary sen doorskins* | | |
| R60/20343–27296 | Shingu Shoko, Ltd. | 9–21–59 | 8.50 |
| R60/8447–24537 | Marutama Lumber Co., Ltd. | 10–31–59 | 8.70 |
| R61/12047–5844 | Shingu Shoko, Ltd. | 12–30–59 | 9.00 |
| | *Rotary sen plywood size ¼″ by 4′ by 7′ or 8′* | | |
| R60/9364–3912 | Ikeuchi Veneer Co., Ltd. | 1–31–59 | 10.50 |
| R60/17857–4765 | Iwakura-Gumi Lumber Co., Ltd. | 8–21–59 | 13.00 |
| R61/109–4989 | Shingu Shoko, Ltd. | 8–30–59 | 12.50 |
| R60/22927–27614 | Ikeuchi Industry Co., Ltd. | 1– 1–60 | 12.50 |
| R60/22946–27633 | Teshiogawa Lumber Co., Ltd. | 2– 2–60 | 13.10 |
| R60/19952–292 | Shingu Shoko, Ltd. | 10– 7–59 | 13.50 |
| R60/1726–467 | Ikeuchi Industry Co., Ltd. | 9–25–59 | 11.80 |
| R60/7565–22677 | Ikeuchi Veneer Co., Ltd. | 12–18–58 | 10.60 |
| R61/667–24472 | Matsushita Lumber Co., Ltd. | 10–29–59 | 12.60 |
| R60/19456–23992 | Ikeuchi Industry Co., Ltd. | 10– 2–59 | 12.00 |
| | *Rotary sen plywood size ¾″ by 4′ by 7′ or 8′* | | |
| R60/19520–27067 | Iwakura-Gumi Lumber Co., Ltd. | 11– 2–59 | 24.60 |
| R60/8444–24534 | Ikeuchi Veneer Co., Ltd. | 9–21–59 | 24.50 |
| R60/8446–24536 | Nitta Veneer Mfg. Co., Ltd. | 10– 3–59 | 26.50 |

The court, therefore, concludes as matters of law:

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for determining the value of the merchandise involved herein, except as to appeal R58/8800, and as to that appeal the proper basis for determining the value of the merchandise therein involved is export value, as that value is defined in section 402a(d) of the Tariff Act of 1930, as amended, supra.

2. That such values are as set forth in finding of fact No. 4 above.

3. That appeal R60/19455, having been abandoned, should be dismissed.

Judgment will be entered accordingly.