(A.R.D. 214)

UNITED STATES *v.* GETZ BROS. & CO. ET AL.

Entry Nos. 2141–D. etc.

## Third Division, Appellate Term

(Decided November 25, 1966)

*Barefoot Sanders*, Assistant Attorney General (*Morris Braverman* and *Samuel D. Spector*, trial attorneys), for the appellant.

*Lawrence & Tuttle* and *Glad & Tuttle* (*Edward N. Glad* of counsel) ; *Barnes, Richardson & Colburn* (*Hadley S. King* of counsel), cocounsel; for appellees.

Before RICHARDSON, LANDIS, and NICHOLS, Judges

NICHOLS, Judge: This is an application for review of a decision and judgment of Wilson, J., holding that the proper basis of valuation of plywood exported from Japan during the years 1957 through 1961 was the export value, as defined in section 402(b) or 402a(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, and that such value was represented by the prices at which such plywood was sold by the manufacturers in Japan for exportation to the United States. *Getz Bros. & Co. et al.* v. *United States*, 55 Cust. Ct. 693, Reap. Dec. 11106. The appraised values, which are claimed by appellant to be correct, are the prices at which such merchandise was sold for exportation by trading houses in Japan.

Although the record in this case is voluminous, the issues may be stated as (1) whether such or similar merchandise was freely sold or offered for sale to all purchasers for exportation to the United States by the mills or manufacturers in Japan and, if so, whether it was sold or offered to all purchasers at the same prices; and (2) the effect, if any, of the Japanese requirement that such merchandise could not be exported unless the exporter had an export quota.

Under the quota system, the Japanese Government limited the amount of plywood which could be exported to various parts of the world, including the United States, which was at times included in a quota for North America and at times had a separate quota. (Exhibit F.) Certain percentages of the total quota were assigned to Japanese mills or manufacturers, American firms with branch offices in Japan, and Japanese trading houses, in proportion to the amounts each had previously exported. Apparently there was no discrimination against the United States firms; they got the quotas which their historical position warranted. Getz had the largest quota of any United States concern and the second largest assigned to anyone. An export license could not be obtained unless the exporter had a quota for the shipment. This resulted in the following methods of doing business:

1. Purchasers which had branch offices in Japan and which had quotas of their own, such as Getz Bros. & Co., and Pacific Wood Products Co., purchased directly from the manufacturers at their established price levels and obtained export licenses with their own quotas.

2. Purchasers having no quota could at times purchase from a manufacturer which had a quota and an export license would be obtained using the manufacturer's quota. Manufacturers having large quotas usually added to the price for the use of their quotas, the price depending on market conditions. Manufacturers with small or token quotas did not.

3. Purchasers having no quota could purchase from trading houses which did. Such purchasers often specified the manufacturer from

which the merchandise was to be obtained. The price charged by the trading houses was higher than that charged by the manufacturers and included an amount not separately stated for the use of the quota.

4. Sometimes merchandise was bought from the manufacturer and a quota borrowed or rented from a third party—at a price.

5. There were combination deals in which the purchaser's quota was used to cover part of a shipment and the manufacturer's quota for the balance. The price for the latter portion was higher.

Merchandise was ordinarily produced on order and was not kept in stock. The usual course was for United States importers to obtain orders from their customers, after which they approach their branches in Japan or Japanese trading houses (some of which had branches in the United States) or the manufacturers and made bids or asked for quotations. The branches or trading houses obtained quotations from the manufacturers and orders were given and confirmed. In order to secure merchandise when they wanted it and when export quota was available, United States importers did business with several manufacturers and/or trading houses.

In support of their claim that the merchandise was freely offered by the Japanese manufacturers to all purchasers, the plaintiffs introduced into evidence affidavits from 36 manufacturers. (Plaintiffs' exhibits 1 through 36.) These fall roughly into two classes, exemplified by exhibits 1 and 2. Exhibit 1 is an affidavit of Osamu Tanaka, chief of the export department of Sakamasa Plywood Works, Ltd. It states that the company manufactured and freely offered plywood to anyone who cared to buy for export to the United States; that the price was f.o.b. vessel; that the prices did not vary because of quantity; that plywood sold for export to the United States was not the same as or similar to that sold for consumption in Japan, the size and quality specifications being different; that the manufacturer knew and controlled the destination of the plywood sold for export to the United States as the manufacturer marked it in accordance with instructions of the buyer and the manufacturer delivered it to the exporting vessel, after having received the export permit from the buyer; that in order to secure such a permit it was necessary to have an export quota. The affidavit also stated that production quotas were established in 1957, limiting the amount each mill could manufacture for the United States market, and that, therefore, plywood was offered and sold to American importers and to firms in Japan with the definite understanding that it was not to be resold for consumption in Japan. Sales were made both on the manufacturer's quota in which case an extra charge was made and on the buyer's quota in which case no additional charge was made. A list of prices was attached representing the prices charged in actual sales during particular periods for plywood

items sold for exportation to the United States. Exhibits 7, 9, 14, 19, 21, 22, 23, 25, 26, 27, 28, 29, and 32 are in similar language.

The second group of affidavits, represented by exhibit 2, are from manufacturers which had very little or no export quota. They stated that they were not concerned with export quota restrictions; that it was the responsibility of the buyer to secure his own quota; and that what little quota the manufacturer had was given without charge to purchasers who requested it. Exhibits 5, 6, 8, 10, 11, 12, 13, 15, 16, 17, 18, 20, 24, 30, 31, 33, 34, 35, and 36 are in similar language.

Defendant offered other affidavits, some executed by the same affiants at later dates. Exhibits A, B, C, D, H, I, J, L, M, and P. Exhibit A states, for example, that the manufacturer offered plywood "to any trading house or U.S. importer or branch office of a United States importer which cared to purchase for eventual exportation (either to the United States or other countries)." It states that a few extraordinary sales were accomplished directly between the manufacturer and Getz Bros. in which case the manufacturer's quota was used and a charge was made. It adds that there were no restrictions placed on plywood of the type exported to the United States that would prevent a sale for Japanese consumption, but the nature of it prevented such sales, and that the manufacturer exercised no control over the destination of the plywood. It further states that prices are arrived at through negotiations between the buyer and the manufacturer.

Exhibit B states that the manufacturer has offered plywood to any trading house or branch office of a United States importer but has never sold directly to importers located in the United States "except insofar as branch offices of United States importers located in Japan can be said to be importers located in the United States."

There is testimony given by various witnesses that they had never been refused by a mill when seeking to purchase as long as the production was available and that they had never heard of a mill refusing to sell for exportation to anyone who cared to buy.

Getz Bros. and Pacific Wood Products having branch offices in Japan and quotas of their own, purchased directly from the mills using their own quota. They also sometimes bought from a trading house using the trading house's quota or from a mill using the mill's quota. Del Valle, Kahman & Co., which had a branch office in Japan but which did not obtain a quota until 1960, purchased from the mills and then found a party who had export quota for rent. Mr. Wagner of that company testified that anyone could buy as much plywood from the mills as he wanted but that he could not export it without holding a quota.

A report of George K. Yamauchi, customs line examiner, dated July 17, 1963 (collective exhibit G) states that some manufacturers do

make direct sales to importers located within the United States with no branches in Japan, but that such sales were at higher prices than those to trading houses or Japanese branches of United States importers, because of the "extra risk, work, quota arrangements and exporter's profit that is involved." See, to the same effect, collective exhibit H, with reference to one producer, Eidai Co., Ltd.

Many of the manufacturers sent representatives to the United States to visit American importers in order to promote trade, whether or not sales were eventually made directly or indirectly through trading houses.

As the trial court held, if the manufacturers and the "trading houses" both sold plywood at prices that met the statutory standards for "export value," the manufacturer's price would be the basis of appraisement, *Melba B. Rodriguez* v. *United States*, 23 Cust. Ct. 296, 300, Reap. Dec. 7752. This is not disputed here. It seems clear from the evidence that the manufacturers did offer plywood to all purchasers, but that the group of those who cared to buy from them was limited to those who had or could obtain an export quota. In *National Carloading Corp.* v. *United States*, 43 Cust. Ct. 531, 534, Reap. Dec. 9535 (affirmed *sub nom. United States* v. *National Carloading Corp.*, 46 Cust. Ct. 745, A.R.D. 125), the court held that "all purchasers" with respect to the offer and sale of Japanese plywood meant the exporters or trading houses and the American importers who purchased from the manufacturer for direct export to the United States.

Although it has been conceded that the trading houses were not agents of the American importers, under the circumstances of this case, it would appear that the sales to trading houses, though internal transactions, were sales for exportation to the United States under the principle of *R. J. Saunders & Co., Inc. (Perry H. Chipurnoi, Inc.)* v. *United States*, 42 CCPA 55, C.A.D. 570. In that case, the manufacturer did not permit Canadian purchasers to sell for home consumption but allowed resales for export. Sales were made by the manufacturer to two Canadian companies which sold for export, and the merchandise was shipped direct to the American customers by the manufacturer. It was held that the sales by the manufacturer to the Canadian purchasers could be considered as the basis for finding export value. The court stated (p. 60):

We know of no requirement in section 402(d), *supra*, that the sales be made to purchasers located in the United States.

The Government's reliance on the internal nature of the sales to trading houses to support its position, therefore, seems misplaced. And it is clear that, under the quotas and in view of the lack of domestic demand, the merchandise sold to trading houses had to be exported to a group of countries that included the United States.

The next question is whether the prices at which the mills offered and sold the merchandise were the same to all purchasers and, if so, what those prices were.

Judge Wilson held:

In the opinion of the court, the sales by the manufacturing mills conformed to the requirements of the foregoing statutes. * * * After a careful examination of the affidavits, the court is of the opinion that the pricelist as set forth at the end of plaintiff's brief is correct and that the prices therein set forth represent the export value of the involved merchandise at the time of exportation to the United States, said value being that of such or similar merchandise which was freely offered for sale to all purchasers in the principal markets of Japan at the time in question, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, and that the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, were included in the f.o.b. cost as the merchandise was delivered at various ports for shipments.

We agree.

Plaintiffs state that the prices shown on the schedules attached to their brief were taken from the affidavits of the various mills exhibits 1 through 17 and 19 through 26, and defendant's exhibits H, J, L, M, and P. Exhibit 2 states, for example:

That the only records which are readily available that we have of sales for exportation to the United States that go back to the start of our export operation on doorskins and plywood consists of our shipping ledger which only indicates the date of delivery. However the normal lapse of time between the date of sale and the date of delivery was from two to three months.

That the list of prices taken from our shipping ledger is attached hereto and made a part hereof and marked exhibit A. The prices shown on exhibit A represents the prices charged in actual sales during any particular period for the various plywood items sold by us for exportation to the United States.

Similar statements are found in the other affidavits. A few state that records were lost because of floods caused by typhoons. Exhibits 12, 13, and 29. The schedules attached to plaintiffs' brief state that in some cases, the prices indicated in the affidavit by delivery dates were adjusted back to date of sale.

Defendant claims that these prices do not establish export value for the following reasons:

1. They do not list all sales but represent prices charged in actual sales. Defendant cites *Arthur J. Fritz & Co., Inc.* v. *United States*, 54 Cust. Ct. 530, Reap. Dec. 10908, where it was stated (p. 535):

* * * In addition, the prices here claimed as representative of the value of the imported baby clams are mainly speculative. Willingness to sell merchandise at a certain price is no evidence of a market price.

Here the prices are not merely speculative but purport to represent actual sales as shown by the manufacturer's books. In *United States* v. *Fisher Scientific Company*, 40 CCPA 164, C.A.D. 513, in a case involving usual wholesale quantity, the court declined to set out an all-inclusive formula as to what would constitute substantial evidence, but stated that the challenging party "would be wise to at least present a *summary* of relevant sales for the pertinent time period."

2. Defendant claims that the evidence does not establish the prices at the dates of exportation, since the lists are based on dates of delivery, the actual sales having taken place previously. However, the schedules compiled by plaintiffs have taken this into account. Since the transactions cover a long period of time, prices at the respective dates of exportation can be found.

3. It is further claimed that the sales were not at uniform prices but were at bargained prices. Some of the affidavits offered by defendant state that the prices were arrived at through negotiations between buyer and seller. Exhibits A, B, C, D. Exhibit C states in addition that, since Pacific Wood Products bought in large quantities, it generally enjoyed lower prices. On the other hand, in the report of Mr. Yamauchi, in exhibit G, it is stated (p. 5) :

Each of the manufacturers interviewed stated that their prices to trading houses and to Japanese branches of United States importers were the same on any one day for the same merchandise. Prices on direct sales to United States importers with no overseas branches would be made at higher prices. This is due to the mark-up which must be placed because of the extra risk, work, quota arrangements and exporter's profit that is involved. The direct sales price would then become competitive to the resale price of the Japanese trading houses.

In another report by Mr. Yamauchi, exhibit H, it is stated that the manufacturer, Eidai Co., Ltd., did not issue price lists and that each contract was made on the basis of bids or quotations. It would appear that the higher prices to United States importers not having branches in Japan were due to such importers not having quotas and to the manufacturers having in other ways to assume the role of a trading house.

It appears from the schedules attached to plaintiff's brief that prices did vary between the different manufacturers and at different periods of time. This may account for the fact that sales were made by bids and quotations, and, as the evidence indicates, buyers shopped around for price, quality, and delivery dates.

What was the effect of the Japanese requirement that an export license and an export quota be obtained before merchandise could be exported?

As stated, merchandise could be bought and sold with or without an export quota and an export quota could be the purchaser's, the manufacter's, or a third party's. In some circumstances it had to be paid for and in some circumstances it did not.

In *United States* v. *International Commercial Co., Inc., and Armour & Co.*, 28 Cust. Ct. 629, Reap. Dec. 8112, one of the issues was whether a 20 percent charge placed on the exportation of canned corned beef from Argentina, by the Instituto Argentino de Promocion del Intercambio (I.A.P.I.), a government agency, was part of the export value. The court held that the charge accrued only when the merchandise was exported and was an export tax rather than a part of the market value of the merchandise. In the trial court's opinion, *International Commercial Co., Inc., and Armour & Co.* v. *United States*, 26 Cust. Ct. 607, Reap. Dec. 7980, it is stated (p. 623) :

It appears from the evidence that these items are paid only where the merchandise is exported from Argentina. Prices were ordinarily quoted to purchasers in the United States on an f.o.b. basis, including all these charges, but packers were also willing to sell ex plant or on an f.a.s. basis, in which cases the purchaser made all the arrangements with I.A.P.I., complied with all Government requirements, and paid the above-described charges.

In a previous case involving plywood exported from Japan, *National Carloading Corp.* v. *United States*, 43 Cust. Ct. 531, Reap. Dec. 9535 (affirmed *sub nom. United States* v. *National Carloading Corp.*, 46 Cust. Ct. 745, A.R.D. 125), this court said (p. 540) :

* * * Assuming that such license was required, it does not appear that the requirement was such as would bar a finding that an export value for such merchandise existed. It clearly appears that the existence or issuance of such a license had nothing to do with the offer and sale of merchandise such as that at bar for exportation to the United States. See *F. W. Kuehne Co.* v. *United States*, 12 Cust. Ct. 386, Reap. Dec. 5985, affirmed in *United States* v. *F. W. Kuehne Co.*, 14 Cust. Ct. 356, Reap. Dec. 6110, and *United States* v. *International Commercial Co., Inc., and Armour & Co.*, 28 Cust. Ct. 629, Reap. Dec. 8112.

On appeal, the second division stated (46 Cust. Ct. 753) :

* * * Since, as demonstrated in the opinion below, there is no issue here of principal markets, and the quota limitations, being burdens imposed upon the buyers, were not restrictions upon the free offerings of this merchandise * * * , the presumption of correctness attaching to the appraiser's return of value was overcome by appellee's *prima facie* showing and the burden of going forward with proof shifted to the appellant.

See also *Pacific Wood Products Company, Railway Express Agency, Inc., et al.* v. *United States*, 49 Cust. Ct. 460, Reap. Dec. 10377.

It appears that only persons who had or could get export quotas were in a position to take advantage of the low manufacturer's prices, but in this respect the case resembles *Rico, Inc.* v. *United States*, 48 CCPA 110, 112, C.A.D. 773, wherein our appellate court held that—

\* \* \* A restriction inherent in the packaging of the goods which results in only a certain class of customers desiring to purchase such goods is not a restriction upon offering for sale. It would seem that to defeat the conception of a free offering the restriction would be one involving some form of marketing practice resulting in the arbitrary exclusion from the market of certain customers or classes of customers by a refusal to sell to them on an equal footing with others, or at all.

Here the restrictions are imposed by or are necessary corollaries of the laws of the exporting country and governmental measures taken thereunder, not the marketing practices of the sellers. Anyone who could show that he was within the class authorized to export by the Japanese Government or the proper assignee of one of these could buy from the manufacturers at their established low prices. There is nothing to show discrimination in the original assignment of the quotas, so we need not consider what bearing such discrimination would would have had if it had occurred. That the holder of a quota is able to add a figure to the export price for the use of his quota when the buyer lacks one has no bearing when the sales on which statutory "export value" is based are anterior to the export sales.

We affirm the findings of fact and conclusions of law of the trial judge, which we incorporate by reference, except as to R60/19455 which is not involved herein and which was abandoned and dismissed below.

The decision and judgment below are affirmed. Judgment will be rendered accordingly.