## F. W. KUEHNE Co. *v.* UNITED STATES

**No. 5985.**—Invoice dated Prague, Czechoslovakia, May 23, 1938.
Certified May 24, 1938.
Entered at New York, N. Y., June 9, 1938.
Entry No. 863009.

(Decided February 21, 1944)

*Eugene R. Pickrell* for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Daniel I. Auster,* special attorney), for the defendant.

WALKER, Judge: This is an appeal for reappraisement from the value found by the United States appraiser at the port of New York on a shipment of tanned, dyed, and shaved kidskins exported from Czechoslovakia on May 24, 1938. The merchandise was invoiced at 25 Czechoslovakian kronen per skin, plus packing, but was entered at Kč. 20½ each, plus packing, as representing the foreign value thereof (section 402 (c), Tariff Act of 1930). Appraisement was made on the basis of cost of production (section 402 (f) of the same act) by taking the invoiced price of Kč. 25 per skin to be the costs specified in paragraph (1) of the cost of production formula, adding 10 per centum thereof for usual general expenses covered by paragraph (2), plus packing as invoiced, and plus 8 per centum of the sum of the amounts found under paragraphs (1) and (2) for profit as specified in paragraph (4).

Plaintiff claims that there existed at the time of exportation a foreign value for merchandise such as that in issue within the definition thereof contained in section 402 (c), *supra,* and that it was lower than the entered value; that no export value existed within the meaning of the definition thereof in section 402 (d) of the act, and, alternatively, that if the merchandise be properly dutiable on the cost of production basis of value, such cost of production, as defined in section 402 (f), *supra,* was likewise less than the entered value. It is conceded that no United States value for such or similar merchandise existed.

The definitions or formulas for the various bases of value involved are contained in section 402 of the Tariff Act of 1930, and at the time of importation of the merchandise read as follows:

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

\*        \*        \*        \*        \*        \*        \*

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

A sample of the merchandise involved is in evidence as collective exhibit 3. It appears from the record that the skins in question were bought by the plaintiff from the firm of Arnstein & Pick, of Prague, Czechoslovakia, in the raw state at a price of Kč. 18.50 per skin, and that upon orders of the plaintiff Arnstein & Pick had the skins tanned at a cost of Kč. 2.10 each, colored or dyed at a cost of Kč. 3.25 each, and shaved at a cost of Kč. 1.15 each, making the total cost to the plaintiff Kč. 25 per skin, exclusive of packing. It also appears that the kidskins at bar are what are known as "table-run," that is to say, not selected, but containing an assortment of grades.

On the question of whether at the time of exportation kidskins such as or similar to those in the case at bar, i. e., tanned, dyed, and

shaved table-run kidskins, were freely offered for sale to all purchasers in the principal markets of Czechoslovakia in the usual wholesale quantities and in the ordinary course of trade, there is the testimony of three witnesses for the plaintiff.

The first of these was Julius Heitler, a dealer in glove leather, who, in the period from 1924 to 1938, conducted a business of dealing in glove leather in Czechoslovakia, as well as owned and operated a tannery in Moravia for processing the same. The second was his wife, Mildred Heitler, who had been associated with her husband in the businesses in Prague and Moravia. The third was Charles V. Spitz, a glove manufacturer and importer, who testified that from 1914 to 1939 he was owner of a concern which owned several glove factories in Czechoslovakia, Switzerland, and England, and from 1933 to 1939 had been chairman of the glove manufacturers' association in Czechoslovakia and delegate for the glove industry of that country and appointed by its Government as "arbitrator and referee in the Law Court at the Merchandise Exchange Court in Prague," in which disputes involving all kinds of skins, including kidskins, were tried.

Each of these witnesses was well qualified, by reason of his or her experience in dealing in kidskins such as those in issue at and prior to the time of exportation thereof, to testify concerning market conditions and market value of such skins in Czechoslovakia. Their testimony is more or less cumulative, and establishes that Prague was a principal market of Czechoslovakia for merchandise such as that here involved.

The Heitlers testified that at the time of exportation of the instant merchandise to the United States such merchandise was freely offered for sale in the ordinary course of trade to all purchasers in Prague for home consumption. Mr. Spitz' testimony is to the same effect, and he also added that it was freely offered for sale in the ordinary course of trade for exportation to countries other than the United States. (Exportation and importation of the merchandise at bar took place prior to the effective date of the Customs Administrative Act of 1938 limiting foreign value to offers for sale for home consumption.)

Usual wholesale quantities, according to the Heitlers, were 100 dozen, but it clearly appears from the testimony of Mrs. Heitler that the price did not vary by reason of the quantity purchased, and hence, as pointed out in the case of *Jenkins* v. *United States*, 25 C.C. P. A. 90, T. D. 49093, "no question of usual wholesale quantity can arise."

With reference to the price at which such skins were so offered there is some variance in the witnesses' statements. Mr. Heitler stated that at the time in question, May 1938, he and other dealers were offering table-run kidskins, tanned and colored, at from Kč 15.50 to Kč. 16.50 per skin, and that if the customer wanted them shaved, as was

the merchandise at bar, the cost was Kč. 1 to Kč. 1.25 additional, making a total of Kč. 16.50 to Kč. 17.75 per skin. Mrs. Heitler placed the offer at Kč. 14 to Kč. 14.50, less shaving, and the charge for the latter at Kč. 1 to Kč. 1.20, making a total of Kč. 15 to Kč. 15.70 per skin. Mr. Spitz testified that about the time in question the Sudeten situation became serious and the price of kidskins in Czechoslovakia declined, and, as a matter of fact, never rose again. For that reason, he said, about that time he was able to purchase, and did purchase, in Czechoslovakia kidskins such as those in issue at from Kč. 12.50 to Kč. 13 apiece.

All of these prices are below the entered value, but under the requirement of the statute, section 501 of the Tariff Act of 1930, I must "determine the value of the merchandise." It is apparent from the foregoing that because of the political situation the price for kidskins such as those in issue was not uniform. However, the provision relating to foreign value, section 402 (c), *supra*, contemplates, not a range of prices, such as the evidence indicates here, but "the price" at which such merchandise was freely offered, etc.

The Heitlers gave testimony as to offers; Mr. Spitz gave testimony as to specific sales. While both classes of testimony may be said to rank among the best evidence of market value, I believe I am warranted in accepting the lowest price indicated in an actual sale as more accurately reflecting the true market value than even bona fide offers. Merchandise may be, and very often is, offered for sale at higher than its market value, and this is particularly true in the case of a declining market such as existed in Czechoslovakia at the time of exportation of the merchandise herein.

None of the evidence offered by the plaintiff refers to a Czechoslovakian turnover tax of 8 per centum. The evidence offered on behalf of the defendant in the form of the report of a Treasury representative indicates that when sold for home consumption such a tax would have to be paid on finished kidskins, and that it is added to the prices thereof at the foot of the invoices. I note also that the invoice in the case at bar refers to such a tax. Under the circumstances, I must assume that the tax in question was part of the foreign value. See *United States* v. *Fragele Bros.*, 13 Ct. Cust. Appls. 144, T. D. 40978.

In the brief filed on behalf of the defendant the oral evidence given by the Heitlers and Spitz is criticized on the ground that it is unsupported by documentary proof. The testimonial assertions of these witnesses were supported by their oaths and were tested by cross-examination. The evidence they gave needed no support or corroboration in the form of documentary evidence. I am satisfied that the evidence they gave was sufficient to establish *prima facie* that at the time of exportation of the instant merchandise there existed a

foreign value, as such value was defined in section 402 (c), *supra,* therefor, and that such value was Kč. 12.50 per skin, plus 8 per centum turnover tax, plus packing.

With respect to the question of whether there was at the time of exportation of the instant merchandise an export value therefor as defined in section 402 (d), *supra,* I note it is the contention of the plaintiff that no such export value existed for the reason that the Czechoslovakian Government at the time required exporters to obtain a permit to export merchandise such as that at bar. This is based on the testimony of Mr. Spitz to the effect that the Czechoslovakian glove industry was opposed to the exportation of material from which gloves might be made in foreign countries, in order to have the work done by Czechoslovakian glove makers, and hence the Ministry of Commerce of Czechoslovakia required applications for such permits to be passed upon by experts, of whom Mr. Spitz was one, to determine whether it was to the interest of the Czechoslovakian glove industry to make such exports or to deny them.

There does not appear to have been any uniform basis upon which such applications were granted or denied, although certain of Mr. Spitz' testimony would indicate that an element to be considered was the business character or reputation of the applicant.

It is true that some recent expressions of this court and our appellate tribunal have indicated that any restriction upon the use of purchased goods would be regarded as negativing the existence of a free market (cf. *United States* v. *Graham & Zenger, Inc.,* 31 C. C. P. A. 131, C. A. D. 262), but I do not believe that the record before me shows the requirement of application for an export permit to have been anything more than an administrative regulation designed to effectuate the control which most foreign governments—and, indeed, our own at the present time—place upon the flow of export goods, rather than a restraint as to its disposition. It was, therefore, not a restriction which prevented a free market. The record, and particularly the testimony of Mr. Spitz, indicates that merchandise such as that here involved was freely offered for sale in the principal markets of Czechoslovakia in the ordinary course of trade for exportation to the United States at the time of exportation of the merchandise at bar.

In fact, the record indicates that the offers for sale of such merchandise were the same to all purchasers whether the merchandise was for home consumption, export to countries other than the United States, or export to the United States. This would result in the export value, as defined in section 402 (d), *supra,* being the same as the foreign value, or lower than the foreign value if it be considered that the 8 per centum turnover tax did not apply to export sales. In any

event, it is apparent that the export value was not higher than the foreign value.

At this point it may be noted that there was offered in evidence a certain questionnaire, together with answers thereto, which, it was stated by counsel for the plaintiff, had been completed by a prospective affiant in Czechoslovakia. Counsel stated that an affidavit had been prepared, based upon the answers in the questionnaire, and had been sent abroad, but that, due to the European situation, it had never been returned. There is attached to the papers constituting the questionnaire and answers a "certificate of acknowledgment of execution of document" executed by the American consul at Prague, in which he certifies that the individual who is described in the papers acknowledged to the consul that he executed the same.

Upon objection to the admission of the documents in evidence taken by counsel for the defendant, they were marked exhibit 4 for identification and decision as to their admissibility reserved. I am satisfied that the documents are inadmissible under the ordinary rules of evidence, and I find no statutory authority permitting their admission. The objection to their admission is sustained.

The case for the defendant consists of the report, exhibit 5, of a Treasury representative detailing the result of an investigation he made at the premises of the shipper of the instant merchandise. It is at once apparent that the said report does not purport to set forth any information with respect to market conditions of finished kidskins such as those at bar or similar thereto, but only with respect to the business of the shipper, who, it is said in the report, did not deal regularly in finished kidskins. This latter statement is contradicted by the testimony of Mr. Spitz.

I am satisfied that the evidence offered on behalf of the defendant was insufficient to meet the burden thrust upon it of going forward with the evidence. I therefore find the following facts:

(1) That the merchandise in question consists of tanned, dyed, and shaved table-run kidskins exported from Czechoslovakia on or about May 24, 1938.

(2) That at the time of exportation Prague was a principal market of the country of exportation for such merchandise.

(3) That at the time of exportation kidskins such as those in the case at bar were freely offered for sale to all purchasers in Prague in the usual wholesale quantities and in the ordinary course of trade either for home consumption, export to countries other than the United States, or export to the United States at Kč. 12.50 per skin.

(4) That when sold for home consumption a turnover tax of 8 per centum accrued.

From the foregoing I conclude as matters of law:

(1) That foreign value, as that value was defined in section 402 (c) of the Tariff Act of 1930, at the time of exportation and importation of the merchandise at bar, was the proper basis of value for the merchandise in issue, and

(2) That such value at the time of exportation was Kč. 12.50 per skin, plus 8 per centum turnover tax, plus packing.

Judgment will issue accordingly.