*American Asbestos Corp.*, 48 CCPA 153, 155, C.A.D. 783 (1961); *H. S. Dorf & Co.* v. *United States*, 41 CCPA 183, 189, C.A.D. 548 (1954).

Under this view we are required to determine only whether as a matter of law there is substantial evidence supporting the appealed judgment. Here there was such evidence. The dispositive question of law on which I would decide the issue relates to the interpretation and application of the statutory provisions relating to "export value" and "cost of production." On this question, I agree with the decision of the majority.

UNITED STATES *v.* GETZ BROS. & CO. ET AL. (No. 5279)*

---

*C.A.D. 927.

United States Court of Customs and Patent Appeals, November 9, 1967

*Carl Eardley*, Acting Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Morris Braverman* for the United States.

*Glad & Tuttle (Edward N. Glad,* of counsel), *Barnes, Richardson & Colburn (Hadley S. King,* of counsel) for appellees.

[Oral argument October 3, 1967 by Mr. Braverman and Mr. King]

Before WORLEY, Chief Judge, and Judges RICH, SMITH, ALMOND, JONES**

SMITH, Judge, delivered the opinion of the court:

The issue to be determined in this appeal is whether, as a matter of law, there is substantial evidence in the record to support the lower court's finding of export value under either section 402(b) or section 402a(d) of the Tariff Act of 1930, as amended.[1]

This issue arises in the present appeal by the Government from the decision and judgment of the United States Customs Court, Third Division, Appellate Term,[2] affirming the decision and judgment of the trial judge in reappraisement.[3] A number of appeals for reappraise-

---

**Senior Judge, United States Court of Claims, sitting by designation.

[1] Section 402(b) of the Tariff Act of 1930, 46 Stat. 708, as amended by the Customs Simplification Act of 1956, 70 Stat. 943, 19 U.S.C. 1401a(b) ; Section 402a(d) of the Tariff Act of 1930, 46 Stat. 708, as renumbered by the Customs Simplification Act of 1956, 70 Stat. 943, 19 U.S.C. 1402(d).

[2] *United States* v. *Getz Bros. & Co.,* 57 Cust. Ct. 750, A.R.D. 214 (1966).

[3] *Getz Bros. & Co.* v. *United States,* 55 Cust. Ct. 693, Reap. Dec. 11106 (1965).

ment were consolidated, but the consolidated cases were limited to plywood of the lauan or the sen species, in a blend of 50 percent first quality and 50 percent second quality, and in a variety of sizes, i.e., in doorskin sizes, $\frac{1}{4}$ inch, in 4 by 7 or 4 by 8 feet sizes, and $\frac{3}{4}$ inch, in 4 by 7 or 4 by 8 feet sizes. The plywood in issue was exported from Japan between 1957 and 1961. One appeal, R58/8800, relating to lauan doorskins manufactured by Noda Plywood Co., Ltd., covers plywood exported from Japan on or about March 26, 1957. This merchandise was appraised on the basis of export value as defined in section 402a(d) of the Tariff Act of 1930, as amended. The Government conceded that, as to this merchandise, export value is the proper basis of appraisement. The remaining appeals relate to merchandise exported from Japan after February 28, 1958. This plywood was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended. It was stiplulated between the parties that, since lauan and sen plywood are not on the final list promulgated under the Customs Simplification Act of 1956,[4] the merchandise was subject to appraisement under this section of the 1930 Act.

A summary of the particular circumstances which existed in Japan at the time of exportation of the plywood in question provides a background for understanding the basis of the present dispute.[5] In late 1955 the decline of the price of plywood, due primarily to an overexpansion of production capacity, caused Japan to establish a quota and licensing system. Under the quota system, the Japanese Government limited the amount of plywood which could be exported to various parts of the world, including the United States. When the export quota allocation system was first established, it applied to sen, lauan and birch plywood exported to North America, South America, Hawaii, England and Ireland. During 1956, England was removed from the quota allocation arrangement. Later, however, during 1959, quotas were established for the United States, for Hong Kong, and for other areas. After 1960, one quota was established for North and South America, including Hawaii.

The quota allocations were assigned to Japanese mills or manufacturers, Japanese trading houses, American firms with branch offices in Japan, and to others, in proportion to the amounts of plywood each had exported during a specified base period. A quota was assigned to the mills only when they had likewise acted in the capacity of an exporter during the base period. While about 80 percent of the available quota was reserved to members of the Japanese Plywood Exporters Association, the remainder of the authorized export quota

[4] T.D. 54521, 93 Treas. Dec. 14 (1958).
[5] See *Pacific Wood Products Co. and Railway Express Agency* v. *United States,* 49 Cust. Ct. 460, 462, Reap. Dec. 10377 (1962), discussed *infra*.

was allocated to "outsiders," or non-members of the Association. Quotas were obtained by United States firms when their historical positions so warranted. Getz Bros. & Co., one of the appellees here, had the largest quota of any United States firm and the second largest quota overall.

To provide for the effective enforcement of the quota allocation arrangement, it was necessary to obtain export licenses in order to export plywood. During the period in question, such export licenses were granted by the Japanese Ministry of International Trade and Industry (MITI). An export license could not be obtained from MITI unless the exporter had a quota for the shipment.

As stated by the Appellate Term, 57 Cust. Ct. at 751, the quota system resulted in the following methods of doing business:

1. Purchasers which had branch offices in Japan and which had quotas of their own, such as Getz Bros. & Co., and Pacific Wood Products Co., purchased directly from the manufacturers at their established price levels and obtained export licenses with their own quotas.

2. Purchasers having no quota could at times purchase from a manufacturer which had a quota and an export license would be obtained using the manufacturer's quota. Manufacturers having large quotas usually added to the price for the use of their quotas, the price depending on market conditions. Manufacturers with small or token quotas did not.

3. Purchasers having no quota could purchase from trading houses which did. Such purchasers often specified the manufacturer from which the merchandise was to be obtained. The price charged by the trading houses was higher than that charged by the manufacturers and included an amount not separately stated for the use of the quota.

4. Sometimes merchandise was brought from the manufacturer and a quota borrowed or rented from a third party—at a price.

5. There were combination deals in which the purchaser's quota was used to cover part of a shipment and the manufacturer's quota for the balance. The price for the latter portion was higher.

Issues involving the same general type of merchandise from Japan have previously been decided in *Pacific Wood Products Co.* v. *United States*, 49 Cust. Ct. 460, Reap. Dec. 10377 (1962); *Ziel and Co.* v. *United States*, 49 Cust. Ct. 454, Reap. Dec. 10374 (1962); and *United States* v. *National Carloading Corp.*, 46 Cust. Ct. 745, A.R.D. 125 (1961). In each of these cases, it was determined by the court that the particular facts established, prima facie, that the plywood in issue was freely offered and sold to all who cared to buy in the principal markets of Japan in the ordinary course of trade without restriction, other than that the plywood be exported and not resold for consumption in Japan. On the facts, a finding of export value was not barred by the restriction that the merchandise must be exported since export value was concerned only with the price for exportation to the United States. *R. J. Saunders & Co. (Perry H. Chipurnoi, Inc.)* v. *United States*,

42 CCPA 55, C.A.D. 570 (1954). Thus, in each instance the mill prices were used in the determination of export values. Furthermore, in each of the cited cases only one manufacturer was involved, whereas in this appeal, counsel for both parties, in order to present a broader view of the export plywood industry of Japan, selected representative *appeals* arising from shipments of plywood manufactured by 25 Japanese mills.

The provisions of the tariff laws pertinent to this appeal are:

Section 402(b):

EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402a(d):

EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

In the trial court, appellees called 16 witnesses, and introduced 82 exhibits into evidence on their behalf. The Government called 8 witnesses, and introduced 19 exhibits into evidence. One of the witnesses was called by both parties. The record is thus, as characterized below, "voluminous."

In the words of the trial court, 55 Cust. Ct. at 694, the "heart of the controversy" is:

* * * whether the export value of the involved plywood was properly determined by the Government, which took the prices at which such or similar merchandise was sold or offered for sale at the time of exportation to the United States by *certain trading houses which placed orders with manufactures* [sic] *on behalf of American exporters*, or whether the export value should have been determined by the price at which such or similar merchandise was sold or offered for sale at the time of exportation to the United States *by the mills or manufacturers*. If such mills or manufacturers sold or offered for sale at the time of exportation of the merchandise such or similar merchandise freely and to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade,

for export to the United States, then the export value should have been determined by the prices at which such mills' or manufacturers' sales or offers for sale were made. [Emphasis added.]

The trial court first considered whether the mills or manufacturers of plywood in Japan that produced and sold the merchandise in question offered such or similar merchandise freely for sale to all purchasers in the ordinary course of trade for export to the United States.

After discussing *National Carloading, Ziel,* and *Pacific Wood Products,* supra, in view of the evidence before it, the trial court found, id. at 697, that:

It appears to the court that the facts in the present cases are stronger in support of finding that the sales by the manufacturing mills provide the proper basis for determining export value than are the facts in the previously decided cases. In the present case, certain facts are established by a heavy preponderance of evidence. In the affidavits offered in evidence by the plaintiffs, all of which are substantially the same, it definitely appears that all the manufacturing establishments from which purchases were made in the appealed cases herein offered their merchandise for sale to all purchasers who desired to buy for export to the United States and not merely to the so-called trading houses.

The court further found, id. at 698, that:

Furthermore, the oral evidence indicates that, in substantially all, if not all cases, the plywood was sold to an American importer before it was manufactured, and as it was manufactured it was marked with the American importer's brand. These markings were made at the request of the purchaser, usually at the time the orders were placed, or when doorskins were ordered at the time the specifications for these doorskins were received * * *. It further appears satisfactorily from the evidence that the trading houses had no merchandise of their own to sell at any time. The trading houses acted merely as agents for American importers. The trading houses never placed orders with the mills for the purchase of plywood until they had received purchase orders from American importers. The marking of the crates and panels was done at the mills by mill personnel * * * The record further discloses that it was the responsibility of the American buyer to obtain a quota for export of plywood as the basis for securing a permit to ship the plywood out of Japan. The responsibility of obtaining the quota and shipping permit rested upn the purchaser (plaintiffs' exhibits 1 through 36 and defendant's exhibits E, F, and G), and not upon the manufacturers and did not affect the free market between the manufacturer and the purchasers. The existence or issuance of an export license had nothing to do with the offer and sale of merchandise such as that at bar for exportation. [Citation omitted.] Further, while admittedly export quota had a value (Witness Davidson, R. 293, and defendant's exhibit A), the additional cost that some mills charged for the use of their quota was no part of the purchase price of the export plywood nor any part of the costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. Plywood is the merchandise being exported and not export quota. It appears that when a mill charged for arranging an export permit, this extra charge was lumped with the purchase price of the plywood for convenience in billing. Such charge, however, was not a part of the *per se* value of the merchandise. * * * any charge made by the mill for an export quota in those instances where the importer did not have such

quota, which apparently is only an expense in obtaining an export license, must be considered an expense occurring after the merchandise has been placed in condition, packed ready for shipment to the United States, and is not a part of the value of the merchandise exported. [Citations omitted.]

The trial court concluded, id. at 699:

We are of opinion that the evidence clearly shows that the manufacturers of the merchandise herein involved offered their product in a free market to all purchasers in accordance with the conditions specified in the tariff act. * * *

\* \* \* \* \* \* \*

In the opinion of the court, the sales by the manufacturing mills conformed to the requirements of the foregoing statutes. * * *

The Appellate Term affirmed the decision and judgment of the trial court, stating, 57 Cust. Ct. at 751, that the issues involved were:

(1) whether such or similar merchandise was freely sold or offered for sale to all purchasers for exportation to the United States by the mills or manufacturers in Japan and, if so, whether it was sold or offered to all purchasers at the same prices; and (2) the effect, if any, of the Japanese requirement that such merchandise could not be exported unless the exporter had an export quota.

In affirming, the Appellate Term considered it to be "clear from the evidence that the manufacturers did offer plywood to all purchasers, but that the group of those who cared to buy from them was limited to those who had or could obtain an export quota." Although it had been conceded, contrary to the opinion of the trial court, that the trading houses were not agents of the American importers, under these circumstances, the Appellate Term was of the opinion that the sales to the trading houses, "though internal transactions, were sales for exportation to the United States under the principle of *R. J. Saunders & Co., Inc. (Perry H. Chipurnoi, Inc.)* v. *United States*, 42 CCPA 55, C.A.D. 570."

As to the effect of the Japanese requirement that an export license and an export quota was required before merchandise could be exported, the Appellate Term stated, id. at 758.

It appears that only persons who had or could get export quotas were in a position to take advantage of the low manufacturer's prices * * *.

\* \* \* \* \* \* \*

Here the restrictions are imposed by or are necessary corollaries of the laws of the exporting country and governmental measures taken thereunder, not the marketing practices of the sellers.

The Appellate Term further found that, although the holder of a quota is able to add a figure to the export price for the use of his quota when the buyer lacks one, it considered that this practice "has no bearing when the sales on which statutory 'export value' is based are anterior to the export sales."

The Government's position here is predicated on the application of

the express requirements of sections 402(b) and 402a(d) of the Tariff Act of 1930. The primary question is whether the record contains substantial evidence which supports a finding that the "price" of plywood at the manufacturer's level is "price" within the definition of "export value" in the applicable sections of the tariff laws. Fundamental to the discussion herein, as both the trial court and the Appellate Term correctly noted, is the proposition that if a manufacturer, or original seller, i.e., a mill, and a dealer, i.e., a "trading house," both sold plywood at a price which met the statutory standards for "export value," the manufacturer's price is the basis of reappraisement. *R. J. Saunders & Co. (Perry H. Chipurnoi, Inc.) v. United States,* supra; *United States v. S. S. Kresge Co.,* 26 CCPA 349, C.A.D. 39 (1939); *Melba B. Rodriguez v. United States,* 23 Cust. Ct. 296, 300, Reap. Dec. 7752 (1949).

As a matter of law, our duty here is to determine whether the findings below are supported by substantial evidence in the record. More particularly, the question is whether there is substantial evidence to support the finding of the lower court that the manufacturers' mill prices of plywood provide the basis for determining "export value." The evidence was fully discussed and weighed by both the trial court and by the Appellate Term in finding the facts on which the export value was determined. In reappraisement proceedings it is the exclusive statutory province of the single judge and Appellate Term of the Customs Court to make findings of fact which when supported by substantial evidence are conclusive upon us, *Saunders,* supra. As this court stated in *United States v. North American Asbestos Corp.,* 48 CCPA 153, 155, C.A.D. 783 (1961):

This being a reappraisement case, the only question before us is whether, as a matter of law, there is any "substantial evidence" to support the judgment below. It is not our province to weigh the evidence. [Citations omitted.]

See *Erb & Gray Scientific, Inc. v. United States,* 53 CCPA 46, 47, C.A.D. 875 (1966); *United States v. Acme Steel Co.,* 51 CCPA 81, 84, C.A.D. 841 (1964); *H. S. Dorf & Co. v. United States,* 41 CCPA 183, 189, C.A.D. 548 (1954); 28 USC 2637. Appellant's arguments urging error below must be considered on this basis.

The four major arguments of the appellant are directed to alleged errors of the Appellate Term in the following respects: [6]

(1) in holding that sales of plywood made by the mills to the trading houses in Japan, established to be internal sales and without restriction on disposition of resale, met the statutory requirements for "export value";

---

[6] The trial court found "no questions" in the case concerning principal markets; price variation according to the quantities sold; unit values of the plywood according to quantities sold; cost of containers and coverings; and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, nor have issues relating to these matters been raised here.

(2) in finding that operation of the export quota and licensing system in Japan did not limit the class of buyer so that the plywood was not freely offered to all purchasers at the lower mill prices;

(3) in finding that the difference between the mill price and the trading house price was accounted for by the addition of a figure by the holder of a quota for the use of his quota; and

(4) in finding that a single price to all purchasers at the claimed values was established.

Proceeding now to an evaluation of each of the Government's foregoing arguments, it is the Government's view that sales made by the manufacturers of plywood to "trading houses" in Japan without restriction on the disposition or resale of the plywood in Japan or elsewhere did not conform to the statutory conditions for establishing "export value." According to the Government's contention, the provisions of section 402 of the Tariff Act defining "export value" require that the price to be considered shall be the price at which such or similar merchandise is freely sold "for exportation to the United States."

Thus, the Government argues in its brief that:

* * * The sales in the cases at bar do not even rise to the dignity of "export sales"; each of the transactions was entered into between the mills and the trading houses as pure domestic sales in Japan; each was negotiated in Japanese currency, without the requirement of clearing such sales through MITI; *and* each sale was entered into without any restriction by the mill *requiring* the exportation of the plywood, let alone a restriction that the merchandise be exported to the United States. Such unrestricted sale by the mill to the trading house permitted any buyer in Japan to seek a buyer at the most advantageous price and to increase the amount of profit of the trading house. Trading houses were free to sell the plywood in Japan, either to other buyers who might eventually seek to export it, or even to buyers in countries other than the United States * * *.

On this point, the Appellate Term stated, 57 Cust. Ct. at 754.

Although it has been conceded that the trading houses were not agents of the American importers, under the circumstances of this case, it would appear that the sales to trading houses, though internal transactions, were sales for exportation to the United States under the principle of *R. J. Saunders & Co., Inc.* (*Perry H. Chipurnoi, Inc.*) v. *United States*, 42 CCPA 55, C.A.D. 570. * * * The court [in *Saunders*] stated (p. 60) :

We know of no requirement in section 402(d), *supra*, that the sales be made to purchasers located in the United States. (Brackets added.)

The Government seeks to distinguish the case at bar from *Saunders* and *National Carloading*, supra, on their respective facts. In *Saunders*, supra, the manufacturer did not permit Canadian purchasers to sell for home consumption but allowed resales only for export. In *National Carloading*, supra, the sale of plywood was made *on the condition* that it be exported. The Government's exhibits show that

no restrictions were imposed by the mills on the "trading houses" or other exporters. In effect, there appeared to be no restriction on the disposition and resale of the plywood at bar either in Japan or other countries.

The Government's exhibits were considered below in the light of appellee's 36 affidavits, wherein the affiants all state that their respective firms "know and control" the destination of the plywood. In appellant's exhibits A through D, the affiants state that it is the nature of the plywood and doorskins alone that prevent its sale in Japan. Further evidence is found in the record to indicate that all the mills sold their export plywood at an f.o.b. Japanese port price. The price included delivery to the exporting vessel.

Thus, it appears from substantial evidence in the record that, ▮ notwithstanding the absence of a specific restriction that the plywood be exported, there was an effective control which assured the mills or manufacturers that the plywood was being sold for exportation. As the Appellate Term found and we agree:

\* \* \* it is clear that, under the quotas and in view of the lack of domestic demand, the merchandise sold to trading houses had to be exported to a group of countries that included the United States.

The record contains substantial evidence which supports the above finding of the Appellate Term. Thus, it appears that the Japanese mills would only manufacture against orders for future delivery; that the mills making plywood for exportation had a production quota, whereas mills making plywood for local or domestic consumption had no similar production quota; that the quotas were divided into three separate areas, one of which included "North and South America, Caribbean countries and Hawaii"; that a quality control was imposed on door sizes to the United States only; that the mills would receive marking instructions for marking the crates with the name or initial of the American importer usually at the time the orders were placed, or at the time the specifications for the doorskins were received; that the mills could not begin to manufacture doorskins until the specifications had been received; that some importers would also request that each individual panel be given a special marking, and that marking of the crates and panels was done at the mills by mill personnel. Furthermore, the record shows that when anyone who cared to buy for exportation to the United States approached a mill, the mill was required to obtain a clearance. The clearance was granted if the mill had an available production quota for North America in manufacturing plywood for exportation to the United States. Therefore, the mill would be required to know whether a particular order was for exportation.

Applying the principle enunciated in *Saunders*, supra, the nature of

the transactions under scrutiny herein do not seem to us to "operate in derogation of the establishment of a freely offered price *for export to the United States*." [Emphasis added.]

All this constitutes substantial evidence in support of the findings of the lower court. We therefore do not agree with the first of the Government's arguments.

The appellant next urges that the Appellate Term erred in finding that the export quota system in Japan did not operate to limit the class of buyers with the result that the plywood was not "freely offered" to all purchasers at the lower mill prices.

The applicable provisions of section 402a(d) and 402(b) of the tariff laws both require, in finding "export value," that the merchandise must be freely sold or offered for sale to all purchasers in the ordinary course of trade. These requirements, as used in section 402, have been interpreted to mean that the merchandise must be "freely sold" or "offered for sale" to "all those who cared to buy such goods in such market" in the ordinary course of trade. Moreover, the merchandise need not be freely offered to all purchasers without limitation, but rather "in the ordinary course of trade." *United States* v. *Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590 (1955); *United States* v. *American Glanzstoff Corp.*, 24 CCPA 35, T.D. 48308 (1936).

Appellees' position is:

The fact that the purchaser must comply with these export regulations imposed by the Japanese authorities under a quota system controlling the exportation of plywood from Japan in no way limits the free offering on the part of the manufacturers of their product to all who cared to purchase. It was the responsibility of the purchaser, be he an American or a Japanese trading house, to secure an export license from Japan under the existing quota system. * * *

In our view, ▮▮▮ requirements imposed by a sovereign which control the flow of goods from the country of the sovereign for a variety of reasons, do not prevent the lower court from finding that a free market existed. The existence of such a requirement does not defeat the concept of a "free offer" by the seller. Requirements such as quota limitations are clearly distinguishable from restrictions upon the free offering of merchandise imposed by the seller which arbitrarily exclude certain purchasers or classes of purchasers from buying from the seller. *Rico, Inc.* v. *United States*, 44 Cust. Ct. 788, A.R.D. 121 (1960), affirmed, 48 CCPA 110, C.A.D. 773 (1961). See *Pacific Wood Products Co.* v. *United States*, supra (export quota); *National Carloading Corp.* v. *United States*, supra (export quota); *United States* v. *International Commercial Co. and Armour & Co.*, 28 Cust. Ct. 629, Reap. Dec. 8112 (1952); and *F. W. Kuehne Co.* v. *United States*, 12 Cust. Ct. 386, Reap. Dec. 5985 (1944), affirmed *United States* v. *F. W. Kuehne Co.*, 14 Cust. Ct. 356, Reap. Dec. 6110 (1945). Compare *United*

*States* v. *Graham & Zenger, Inc.*, 31 CCPA 131, 134, C.A.D. 262 (1943) (Belgian government precluded purchaser from disposing of property for any use except home consumption) ; *United States* v. *Mexican Products Co.*, 28 CCPA 80, C.A.D. 129 (1940) (discounts allowed to purchaser by manufacturer dependent upon either the status of the purchaser or his bargaining ability) ; and *United States* v. *Glanzstoff Corp.*, supra (offer coupled with restriction that "loyalty discount" may be canceled by seller).

As this court stated in *Rico*, 48 CCPA at 112:

\* \* \* It would seem that to defeat the conception of a free offering the restriction would be one involving some form of marketing practice resulting in the arbitrary exclusion from the market of certain customers or classes of customers by a refusal to sell to them on an equal footing with others, or at all.

On this basis, we thus conclude that, as a matter of law, substantial evidence appears in the record to support the finding of the lower court that such merchandise was "freely offered" within the meaning of the statute.

Appellant next argues that the Appellate Term erred in finding that the difference between the mill price and the "trading house" price was represented by the addition of a figure for use of a quota. Such a finding implies that the quota or use of the quota was an independent consideration in all cases from the sale of the plywood, and thus the alleged charge was never part of the purchase price of the merchandise itself. The testimony refers to the price difference in several manners, i.e., "as a commission," "borrowed a quota," "rented a quota" or "added a profit." From these inconsistencies, the Government concludes that the difference between the mill and trading house prices was the "profit" added by the trading houses in the usual commercial sale of plywood.

The record shows that some of the mills involved do not have any export quota or so little export quota that they did not charge for its use. Others had sufficient export quota to charge a premium when the plywood was exported under their quota.

It is clear that ▮ the finding of the lower court on this issue is supported by substantial evidence that on some occasions, the export quota had to be paid for, and in other circumstances, it did not. Thus, such charges for a quota, which sometimes occurred, formed no part of the purchase price of the plywood for export, nor did it, in our view, within the statute, form any part of the costs, charges and expenses incident to placing the merchandise in condition packed ready for shipment to the United States. Such quota charges, or premiums, clearly occurred after the goods had achieved this status. Cf. *United States* v. *International Commercial Co. and Armour & Co.*, supra.

The Government's terminal argument asserts that the Appellate Term erred in finding that the record established a single price to all purchasers at the claimed values. In essence, it is contended that there is an absence of proof as to the price at which such or similar merchandise was offered for sale in the principal markets of Japan to all purchasers in the ordinary course of trade for exportation to the United States.

It is fundamental that the value returned by the appraiser is presumed to be correct and that anyone challenging the appraiser's values must prove, by competent evidence, facts showing the price at which the merchandise was freely sold or freely offered for sale to all purchasers, in usual wholesale quantities and in the ordinary course of trade for exportation to the United States. *Kobe Import Co.* v. *United States*, 43 CCPA 136, C.A.D. 620 (1956) ; *Brooks Paper Co.* v. *United States*, 40 CCPA 38, C.A.D. 495 (1952).

The appellees' proofs show actual sales taken from the business records of the various plywood mills. The record shows that prices did not vary because of the quantity of plywood purchased. The trial court considered the appellees' proofs to be sufficient to overcome the presumption of correctness attached to the appraiser's value, and the Appellate Term agreed stating :

The next question is whether the prices at which the mills offered and sold the merchandise were the same to all purchasers and, if so, what those prices were.

Judge Wilson held :

In the opinion of the court, the sales by the manufacturing mills conformed to the requirements of the foregoing statutes. * * * After a careful examination of the affidavits, the court is of the opinion that the price list as set forth at the end of plaintiff's brief is correct and that the prices therein set forth represent the export value of the involved merchandise at the time of exportation to the United States, said value being that of such or similar merchandise which was freely offered to sale to all purchasers in the principal markets of Japan at the time in question, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, and that the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, were included in the f.o.b. cost as the merchandise was delivered at various ports for shipments.

In this court appellant again urges that the prices submitted by the appellees do not establish export value for several reasons, the substance of which has been previously considered. Upon a review of the record, we find substantial evidence to support each finding of the lower court which is here challenged by the appellant.

Accordingly, we *affirm.*